The defendant then called the sheriff of Pasquotank, who proved that Muse left a large estate; that Blount, his executor, in January, 1825, sold slaves which had belonged to the testator to the amount of $14,500; that the sale was upon a credit, and for notes negotiable at the office of the plaintiffs in Edenton; that Blount conducted the sale, and that the member of the board of directors alluded to at the meeting in Edenton was present; that the notes were taken by Blount with the knowledge and consent of that gentleman; that the execution upon the judgment in favor of the plaintiffs was not delivered to him before or at the sale, nor ever in Pasquotank County, nor did he hear thereof until some weeks after it; that at the time of the sale he had sundry fi. fas. against Blount as executor, on which was due a balance of six or seven thousand dollars, and which were levied on the slaves; that at the request of Blount he relinquished the levy, and some days thereafter went to Edenton, when Blount paid him the amount of the fi. fas.; there he first received the execution on the judgment for this debt, and was directed to make the return of nulla bona testatoris. The witness further proved that in the evening of the day when Muse's negroes were sold one of the defendants asked the director who attended the sale what was done with this debt, or whether it was satisfied. To which he replied: "You are safe, *Page 326 
for the bank has agreed to take notes of Blount; some have been submitted to and approved by the board, and Blount is now taking others, which will cover the balance."
Mr. Skinner was again called, and proved that in May or June, 1825, he, on behalf of the defendant Wilson, applied at the bank to learn the situation of the debt for which the (487) defendant was bound, believing that Blount could pay the debt if it was then placed under their control, which the witness was willing to effect by advancing the money for their benefit. That to his inquiry what was the situation of the debt, and whether the indorsers were discharged, he was answered by the cashier, Blount, that they were, the debt having been paid by him, and the whole business settled. It was proved by Mr. Creecy, the bookkeeper of the plaintiff, that neither cash nor notes had been paid into the bank on account of the debt by Blount; and he further stated that the cashier was the only person who could receive cash and grant acquittances for debts due the bank; that no director had this power, and that the cashier was the general agent of the corporation. The witness also proved that some time in the summer of the year 1825 the defendant Wilson came to the bank and asked Blount what had been done with this not, and whether the debt had been settled, to which the cashier replied, "It is paid, and you are discharged"; that as soon as the defendant had gone out, the witness asked Blount "if the debt was settled, why not make the entries accordingly, " to which Blount replied, "It is done, or it will or shall be done, which is the same thing, and then the entries can be made."
Blount died insolvent, and this suit was commenced in March, 1826.
His Honor, Judge Ruffin, charged the jury "that in point of law the declaration of a creditor that a debt to him was paid was prima facie evidence of that fact, and that the declaration to the same import of a general agent, such as the cashier had been represented by the witnesses Creecy to be, was within the scope of his authority, and would have the like operation with that of the principal himself. That in this case the jury were at liberty to infer the payment of the debt from the (488) express words of the said Blount, unless the inference of fact should be repelled, in their opinion, by the testimony of Creecy; in which latter case they could not find for the defendant upon the ground of an actual payment; and in that event it would be necessary for the jury to consider the other points of defense arising out of the testimony. In relation to *Page 327 
that insisted on by reason of time having been given by the plaintiff to John G. Blount, it was not true that every giving of time by the holder of a note to the maker would discharge the indorsers. Nor was it generally true, but was so only under particular circumstances and in a certain sense. On the contrary, the general rule was that after the holder had, by due diligence in demanding payment from the maker and giving the indorser notice of nonpayment, fixed the indorser, the contract of the indorser being separate and distinct from that of the maker, his obligation to pay became likewise independent, and the holder was not compelled to proceed further against the maker, but might sue the indorser alone. That in this case, therefore, the plaintiff was not bound to sue Blount in the first instance, nor were the defendants discharged by the mere delay of the bank in not suing the maker, or his executor, sooner; nor by not taking out execution on the judgment after it was obtained; nor by the bank merely not proceeding on the execution; nor by any other mere delay of the plaintiff to compel payment by Blount. But although such was the general rule of law, yet the indorsers had certain rights, arising out of the relations of the parties to the note, which the holders must take care not to interfere with by altering those relations to the prejudice of the indorsers. That one of those rights, for instance, was that of the indorsers to ultimate recourse against the maker after the former should have taken up the note from the holder. And, therefore, if the holder released the maker, or compounded the debt, by taking from the maker a new security in satisfaction of the first note, these acts would discharge the indorsers. That another of these rights was that of the (489) indorser to demand, at any time, of the holder to receive payment from the indorser, and to surrender to him the security in such a situation as to enable the indorser to have immediate recourse to the maker; and, therefore, if the holder, by way of compounding with the maker, or by any other new and independent contract with him, enlarged the time of payment for a definite period, before the expiration of which the maker could not be sued on the note or be compelled to pay the money due by reason of the note having been given, the holder must, in such case, look to the maker alone, on his own new contract; for that by such acts the indorser was discharged, seeing that thereby the remedy on the note against the maker was suspended and the right of the indorser instantly to enforce it interrupted. If, therefore, in this case there was, after the agreement of the bank with Wilson to send an execution to Pasquotank, as stated *Page 328 
by Skinner, a new agreement made between the plaintiff and Blount, without the knowledge and concurrence of the indorsers, that the bank should not sue out the execution, but forbear the whole debt for some definite time, upon Blount's own engagement to pay the debt with other promissory notes, and the plaintiff, trusting to such promise of Blount, and in consideration thereof, did not send out, but withheld, the execution, and did forbear the said debt, that such a forbearance and giving of time were a discharge to the indorsers, and the more especially as in this case the witness proved (if believed) that the execution, if it had been sent out, would have been satisfied out of the slaves belonging to Muse's estate. The court further stated to the jury that such an agreement had not been directly proved by any witness, in express terms, and therefore, if it existed at all, was to be collected by inference only from other facts proved, and that to the jury it was left to draw (490) or reject such inference of fact from the testimony. And the court further instructed the jury that if they should not find such an agreement as above supposed, yet if an indorser, with the view of taking up a note and securing himself against the maker, apply to the holder and inform him of his intention, and offer to pay the sum due on the note, and demand the note or an assignment of a judgment on it, and the holder, knowing that it is not paid, inform the indorser that it is paid, and declare to him that he (the indorser) is discharged, and that the holder will no longer look to the indorser, and refuses to deliver up the security, such acts and declarations of the holder do discharge the indorser; and that the declaration of such a general agent as the cashier of a bank (with the powers and authority said by the witness Creecy to belong to him) to the said Skinner and to the said Wilson, to the effect proved by the witnesses, would have the same effect as if they had been made by the holder himself, being a natural person, though these declarations were false, in that the debt was not paid, unless the falsehood were known to the said Wilson or his agent, and such declarations were made through collusion between the defendants, or one of them, and said Blount, with intent to defraud his principal, the plaintiff. For the law would throw the consequences of the fraud of the plaintiff's agent, not known to the indorser, upon the plaintiff, who employed him, and not on the innocent indorser, and the more especially in this case, since the said declarations if found by the jury to have been made, in one instance were made to said Skinner, who was himself one of the directors, and in the other instance the said *Page 329 
Wilson, in the presence of Creecy, the plaintiff's bookkeeper, who at the same time knew it to be false, and did not so inform the defendant."
A verdict was returned for the defendants, and the plaintiffs appealed.
We think that the jury were not misdirected by the judge in his charge; the judgment must therefore be affirmed.
Approved: Smith v. R. R., 68 N.C. 107; Womble v. Fraps, 77 N.C. 198;Summerow v. Baruch, 128 N.C. 206.